**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 07-52-DLB-CJS**

**GREGORY R. SCOTT, ET AL.**                                      **PLAINTIFFS**

**vs.**                        <u>**MEMORANDUM OPINION & ORDER**</u>

**FIRST AMERICAN TITLE INSURANCE COMPANY**            **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \*

Named plaintiffs Gregory and Alicia Scott have filed a proposed class action Complaint, seeking civil damages from Defendant First American Title Insurance Company (First American), on behalf of those persons who paid a title insurance premium to Defendant that exceeded the premium permitted by the rate schedules it had on file with the Kentucky Department Office of Insurance (DOI). Plaintiffs claim that they and the putative class members were overcharged for title insurance and seek to recover the excess premium charges collected "due to [First American's] failure to adhere to its own rate schedule." (Compl. ¶ 2). Specifically, Plaintiffs seek certification of the following class under Federal Rule of Civil Procedure 23(b)(3):

> All persons or entities who own or owned real estate in Kentucky, who in the last ten years financed a mortgage on said Kentucky property, the title to which was insured in connection with a prior mortgage, and who paid a title insurance premium to First American that exceeded First American's Rate Schedule filed with the Kentucky Department of Insurance, within the five years preceding the filing of the Complaint to the present.

-1-

Of the twelve causes of action alleged in their Complaint, Plaintiffs seek class certification of only five: (1) unjust enrichment, (2) recovery under Kentucky's Consumer Protection Act, (3) general liability under Kentucky's statute dealing with adherence to filing rates, (4) general liability under Kentucky's statute penalizing illegal dealing in premiums, and (5) general liability under Kentucky's statute forbidding deceptive practice in the business of insurance.

This matter is before the Court on Plaintiffs' Motion to Certify Class (Doc. # 84). The motion having been fully briefed (Docs. # 89, 93), and after review of the parties' supplemental filings (Docs. # 94, 95, 97-100), the matter is ripe for review. For the reasons stated herein, and because liability cannot be determined on a classwide basis, but only through an individual analysis of each residential refinance transaction falling within the class period, Plaintiffs' motion is **denied**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case originates from a refinance transaction that occurred on November 19, 2004. The Scotts are Kentucky homeowners that refinanced the mortgage on their home through a mortgage broker who obtained a loan for them through Southstar Funding, LLC (Southstar). (Doc. # 1, Ex. B). Defendant First American is a national title insurance underwriter that issues title insurance policies in Kentucky through a network of independent title insurance agents. The law firm of Nielson & Sherry P.S.C., who is not named as a defendant, was the independent Kentucky title agent that issued Southstar's lender's policy for the Scotts' November 2004 refinance.

## Title Insurance Generally

In a residential purchase or refinance transaction, the buyer as well as the lender providing the mortgage need a guarantee that the buyer will have clear ownership of the property. "Title insurance is designed to provide that guarantee by agreeing to compensate the lender (through a lender's policy) or buyer (through an owner's policy) up to the amount of the loan or the purchase price, respectively." General Accounting Office's Report on Title Insurance, April 2006 (2006 GAO Report). An owner's policy insures the owner/purchaser against defects in the seller's title. By contrast, a lender's policy insures the mortgage lender's security interest against title defects as well as priority of the mortgage lien; thus, the insured is the lender and the policy is provided directly to it. Notwithstanding the benefit to the lender, the financing package the borrower receives usually requires him or her to pay for the title examination and the premium for the new loan policy. However, some lenders offer "no cost" refinances in which the lender bears the cost of the title insurance premium to encourage borrowers to refinance.

Title insurance is sold primarily through use of title agents. Before issuing a policy, an agent inspects the title's history by searching public records such as deeds, mortgages, wills, and divorce decrees. Because public records are usually available only locally, the use of local title agents is desirable. The title insurance premium is paid only once—at the time of sale or refinance—and agents retain or are paid a portion of the premium amount as compensation for their title search work and as commission. (2006 GAO Report). Agents then remit the remaining premium amount to the title company. Because the title insurance policy is not recorded, a borrower's chain of title does not reveal whether a prior mortgage transaction was insured by an owner's or lender's policy, if at all. In fact, title

insurance policies usually do not issue until one to two months after closing; a copy is then sent to the lender and to the insurer. The borrower ordinarily does not receive a copy of the policy purchased.

The vast majority of states regulate the title insurance industry though their own state insurance departments. Kentucky is no exception. Title insurers are statutorily required to file their rates with the Kentucky Department of Insurance (DOI) pursuant to Kentucky Revised Statute § 304.22-020. Every title insurer must file its schedule of premium rates before selling title insurance within the state; those rates must further be approved by the DOI. *Id*. To do this, First American tenders its rate manual to the DOI for approval. Once approved, the insurer has a duty to comply with the filed and approved rates. *Id.* All subsequent amendments must also be filed with and approved by the DOI. *Id.* Under the applicable First American Kentucky Rate Manual, a transaction is not entitled to any discounted insurance rate unless title to the property was previously insured. (Doc. # 1, Ex. A) (Doc. # 89, Ex. D).

### Kentucky Mortgage Transaction Practices

Title insurance is not the only method used to protect lenders or buyers against defects in title. Lenders' protect their lien interest using a variety of other products. For instance, Defendants proffered evidence that Kentucky lenders Guardian Savings Bank and Union Savings Bank, Franklin Bank & Trust Company, The Bank – Oldham County, Inc., Bedford Loan & Deposit, and South Central Bank, all regularly order attorneys' title opinions to protect their respective interests. An attorney title opinion does not insure, but rather, *informs* a client of record defects in title so the client has the opportunity to remedy them or reject the transaction. Title Insurance Law § 1:18. To render this opinion, the

attorney conducts an analysis of the record instruments that may affect the claim of title through to the present owner. Defendants further proffered evidence that numerous lenders throughout Kentucky, including Northern, Eastern, Western, and Central Kentucky, do not require title insurance and either allow for alternatives to title insurance or do not require title insurance at all. (Doc. # 89, Exs. 5-7, 10, 12, 13, 15, 16).

### First American's Kentucky Rates

First American provides a variety of title premium rates depending on the level of risk it bears to insure the titled property. Relevant here are First American's Basic, Reissue, and Substitution rates. Both the Reissue and Substitution rates are discounted rates from the basic insurance rate and are offered in real estate transactions that satisfy specific requirements. During the alleged class period (March 2002 – March 2007), three different First American rate manuals were effective at different times: the 1996, 1999, and 2007 Rate Manuals. (Doc. # 89, Ex. 1D) (Doc. # 84, Ex. 14, 15). At the time the Scotts' refinanced their home, a lender's policy was entitled to the Substitution Rate if the following was met:

> a substitution loan is made by a lender to the same borrower on the same property, the title to which was insured by any title insurance company licensed to do business in Kentucky in connection with the original loan.

(Doc. # 84, Ex. 15). If the original loan was insured within eight or ten years—as is the case with the Scotts' original loan—the lender received a discounted rate assessed either on a sliding scale or through the application of a flat rate. (*Id.*). The Reissue Rate applied if:

> the owner of property of which application is made for mortgage title insurance has been insured by an Owner's or Leasehold Owner's Policy issued by any title insurance company licensed to do business in Kentucky covering the same property within 10 years prior to such application.

(*Id.*).

"While the Reissue Rate for Mortgage Polices and the Substitution Rate both provide a discount to lender[s] purchasing mortgage policies, the Substitution Rate applies when the prior qualifying policy is a mortgage policy and the Reissue Rate for Mortgage Polices applies if the prior qualifying policy was an owner's policy." (Doc. # 84, Ex. 17). In other words, a reissue rate is inapplicable in a residential refinance transaction where the borrower is not refinancing for the *first* time. In an effort to take advantage of historically low mortgage rates, the Scotts refinanced their home mortgage four separate times: in July 2002, March 2003, May 2004, and November 2004. (Compl. ¶ 25). Accordingly, the discount rate applicable to the Scotts' November 2004 refinance would have been First American's filed Substitution Rate, not its Reissue Rate.

In an attempt to simplify its Substitution Rate, First American intended to replace its sliding-scale premium schedule, included in its 1996 Rate Manual, with a flat discounted rate.[1] However, due to a clerical oversight, First American failed to include the amended

---

[1]The 1996 Substitution Rate contained a sliding scale discount under which title policies issued in connection with refinance transactions were entitled to a greater discount if the previous policy was issued more recently:

| Age of Original Loan | Rate |
| --- | --- |
| 3 years or under | 30% of regular rate |
| From 3 to 4 years | 40% of regular rate |
| From 4 to 5 years | 50% of regular rate |
| From 5 to 6 years | 60% of regular rate |
| From 6 to 7 years | 70% of regular rate |
| From 7 to 8 years | 80% of regular rate |
| 8 years or over | 100% of regular rate |

(Doc. # 84, Exs. 14, 17). Under the 1999 Substitution Rate, by contrast, a refinance transaction was entitled to a 50% discount of the regular rate—across the board—provided the original policy was issued within the last ten (10) years.

rate schedule with its 1999 amended Rate Manual; thus, the 1999 Substitution rate was never properly approved or on file with the DOI.[2] (Doc. # 84, Ex. 17).

Under the 1999 Substitution Rate, a larger number of residential refinance transactions qualified for the discount than under the sliding scale rate in effect in 1996. In essence, the 1999 Substitution Rate was an inclusive rate more favorable to borrowers in that it applies to transactions involving original policies that are up to ten years old, where the 1996 rate applied a discount only up to eight years. Although not filed with the DOI, First American disseminated its 1999 Substitution Rate to its direct operations as well as to agents who were instructed to implement the 1999 Rate beginning in October 1999. (*Id.*).

During the relevant class period, a majority of First American's insurance policies in Kentucky were issued though independent agents. (Doc. # 89, Ex. 2 at ¶ 4). First American trains its agents through a series of seminars, bulletins, and other materials. The company also provides on-site visits and on-call service. (*Id.* at ¶ 6). In a transaction involving an independent title agent, First American does not have knowledge of or connection to its insured until the premium is remitted via its independent agent. It further has no role in calculating or collecting the premium from the customer. It is First American agents that determine the applicability of a discounted rate in any given transaction.

The information First American receives regarding the underlying real estate transaction for each policy issued is limited. First American has used the data repository and titled production system, First American Direct Operations (FAST), to store data

_____

[2]First American filed a Corrective Substitution Rate Filing to the Kentucky DOI dated March 4, 2008. (Doc. # 84, Ex. 17). Additionally, it was only the 1996 Substitution Rate that was not properly amended. First American adequately amended its 1996 Reissue Rate by filing its 1999 Reissue amendment in its 1999 Rate Manual. (*Id.*).

relative to policies issued directly. FAST maintains the following information: the policy amount, premium amount, borrower name and address, and identity of the lender for each real estate transaction stored. FAST includes a field to allow users to identify whether the policy was issued in connection with a refinance, but the field is not mandatory. However, during the class period, FAST did not contain fields that allowed users to indicate whether the Basic, Reissue, or Substitution Rate was applied or whether a prior title insurance policy existed. (*Id.* at ¶ 5). For each policy issued, FAST also contains the policy image, the title commitment, and search notes. If First American's direct operations performed the closing, FAST also retains the closing file, including the HUD-1 Settlement Statement. (*Id.* at ¶ 6). However, the scanned images in the repository are not searchable. FAST was used in its direct operation branches in Kentucky since 2002. (Doc. # 89, Ex. 3).

To track information on individual agents in Kentucky, First American used the title agents remittance database, WINGS, from 2003-2007. Unlike FAST, WINGS is not a title policy production system; its capability is limited to agent remittance and tracking of funds received. (*Id.* at ¶ 7). Upon remitting First American's percentage of the title insurance premium, Kentucky agents would also forward some limited information relative to the policy issued. Although WINGS had the capability to capture certain information—such as the agent's name, the lender, amount of coverage, etc.—Kentucky agents inconsistently reported such information. Agents reported on a transaction-by-transaction basis, and the information varied based on the level of detail employed by the reporting agent. (*Id.* at ¶ 8). WINGS, however, does not contain fields for the property address, the borrower's name, whether a prior mortgage existed, whether the prior mortgage was insured, or when a prior policy was issued. (*Id.* at ¶ 9). WINGS does provide a data field to indicate whether

a policy was issued at the Reissue or Substitution rate, but it reveals such information only to the extent that each individual agent reported the information. (*Id*. at ¶ 10). Furthermore, the system is unable to identify those transactions that although entitled to a discounted rate, the rate was never applied.

### The Named Plaintiffs

In connection with their November 2004 refinance transaction, the Scotts were required to pay the premium for a title insurance policy that insured Southstar's interest as lender. A lender chooses the insurer of its policy, and as such, Southstar chose First American and directed First American title agent, Nielson & Sherry, to perform a title examination, issue the lender's policy of title insurance, and perform closing services for Plaintiff's refinance transaction. Even though this was not the Scotts' first refinance, their mortgage broker requested that Nielson & Sherry issue the lender's policy at the Reissue Rate, which they received. Plaintiffs allege that First American via Nielson & Sherry failed to charge them the greater discounted Substitution Rate for the lender's policy, which amounted to a rate overcharge in excess of $200.[3] At the time of the Scotts' November 2004 refinance, First American's 1996 Substitution Rate was still on file and approved by the DOI, given its failed attempt to properly file the 1999 amendment.

The named Plaintiffs claim that the putative class members were charged incorrect rates in two ways: (1) First American failed to adequately train and oversee that its independent agents were charging the correct rate (i.e. charging a discounted rate instead of the Basic Rate or a higher discounted rate); and (2) it failed to properly file the 1999 rate

---

[3]Plaintiffs allege they should have been charged $207.30 using the Substitution Rate approved and on file with the DOI on November 19, 2004, but instead were charged $421.80. (Compl. ¶¶ 21-23).

amendments with the DOI, which replaces the 1996 Rate Manual. (Doc. # 84 at 14). Plaintiffs specifically allege they were overcharged as a result of both errors, but acknowledge that some putative class members may have been overcharged due to the faulty rate filing only. (Doc. # 84 at 14 n.13). The cornerstone of Plaintiffs' claims, and of class certification, is their contention that any homeowner who had a prior mortgage within ten (10) years of refinancing on the same property is entitled to a discounted title premium rate from Defendant First American based on the presumption that a prior mortgage is determinative of a prior title insurance policy.

## II. ANALYSIS

### A.    Standard of Review

Federal district courts have broad discretion in determining whether class certification is appropriate. *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). However, the Supreme Court has made clear that, when faced with a motion for class certification, district courts should conduct a "rigorous analysis" of the Rule 23 factors, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147 (1982), with the burden of establishing a sufficient basis for sustaining the motion borne by plaintiff, *Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6th Cir. 1976). It is often "necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160; *see also Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974) ("[O]rdinarily the determination should be predicated on more information than the pleadings will provide.").

Rule 23, then, is more than a mere pleading standard, rather the movant must "affirmatively demonstrate his compliance with [Rule 23]." *Wal-Mart Stores, Inc. v. Dukes*,

131 S.Ct. 2541, 2551 (2011); *see also In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1086 (6th Cir. 1996) (hereafter cited as *In re AMS*) (the burden of establishing all of the necessary requirements rests on the party seeking class certification).  Finally, although a trial court may not inquire into the merits of a claim, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974), the "rigorous analysis" required under Rule 23 will inevitably "entail some overlap with the merits of the plaintiff's underlying claim."  *Wal-Mart Stores*, 131 S.Ct. at 2551.

**B.    Rule 23 Requirements**

A plaintiff seeking to certify a class must meet all four requirements of Rule 23(a) and one of the Rule 23(b) requirements.  Rule 23(a) identifies four threshold requirements for class certification commonly referred to as numerosity, commonality, typicality, and adequacy of representation, which means (1) the class must be so numerous that joinder of all members is impracticable; (2) there exist questions of law or fact common to the class; (3) the claims or defenses of the named representatives are typical of the claims and defenses of the entire class; and (4) the named representative will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23.  An adequate basis for each prerequisite must be pled and supported by the facts.  *Weathers*, 499 F.2d at 1200.

Rule 23(b)(3) class certification, which the Plaintiffs seek here, is appropriate if the issues common to the class predominate over those affecting individual members.  Fed. R. Civ. P. 23.  Under this subsection, the class action must also be the most appropriate vehicle for litigating the claims presented.  F. R. Civ. P. 23(b)(3); *Bremiller v. Cleveland Psychiatric Inst.*, 879 F. Supp. 782, 797 (N.D. Ohio 1995).  "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common

questions and render the class action valueless." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D. Mich. 2001) (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 517 (S.D.N.Y. 1996)).

### 1. "Rigorous Analysis" of the Rule 23(a) Factors

The crux of this case involves Rule 23(a)(2)'s commonality requirement, and ultimately, if any common issues exist, whether such issues predominate for purposes of Rule 23(b)(3).

### (I) Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." As the Supreme Court recently observed in its landmark decision *Wal-Mart Stores, Inc. v. Dukes*, the language of Rule 23(a)(2) is "easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" 131 S.Ct. at 2551 (quoting Richard A. Nagaredea, *Class Certification in the Age of Aggregate Proof*, N.Y.U. L. Rev. 97, 131-32 (2009)). Recitation of common questions alone is insufficient to obtain class certification. What the rule demands is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original). Thus, a class action may be appropriate where the "issues involved are common to the class as a whole and when they turn on *questions of law applicable in the same manner* to each member of the class" such that the common issue may be litigated for all members in an "economical fashion." *Falcon,* 457 U.S. at 155 (quotations omitted and emphasis added).

While there need only be one common issue, that issue must not be at too great a level of generalization or abstractness. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397

(6th Cir.) (en banc), *cert. denied,* 524 U.S. 923 (1998). "[T]he mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). The existence, though, of just any common question is inadequate because "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Sprague*, 133 F.3d at 397. What is necessary is a common issue of resolution of which will advance the litigation. *Id.*

Here, the Court's inquiry into commonality necessarily overlaps with Plaintiffs' merits contention that First American engaged in a pattern of fraud that resulted in Defendant's unjust enrichment, which ultimately hinges on Plaintiffs' claimed entitlement to a discounted rate of title insurance in the first instance. However, the only pervasive pattern Plaintiffs convincingly establish is First American's practice of allowing title agents to assess the borrower's entitlement to and apply the appropriate discount rate in each of its real estate transactions. First American left it to independent agents—who had the access to borrowers' closing files—to review each individual case file and determine whether a prior existing policy was issued for the same property such that a title insurance discount was appropriate.

Plaintiffs have identified the following as common questions:

(1)     whether Defendant and its agents systematically collected premiums from Class members in amounts not permitted under their approved rate filings;
(2)     whether Defendant failed to properly train/or audit its agents in Kentucky;
(3)     whether Defendant disseminated the 1999 Substitution Rate and instructed its agents to follow it despite it not having been filed with the Kentucky DOI;
(4)     whether Defendant ensured that each consumer received the lowest rate to which he or she was entitled;

(5)     whether Defendant was unjustly enriched by its improper conduct; and
(6)     whether Plaintiffs and members of the Class have sustained damages and the proper measure of such damages.

(Doc. # 84 at 22).  Plaintiffs assert the *central* common question is whether  the Class was entitled to the discounted rates on file; the other side of this coin is invariably whether First American was unjustly enriched.  (*Id.*).  This inquiry, however, cannot be determined in "one stroke" for all class members without inspection of individualized proof.  *Wal-Mart Stores*, 131 S.Ct. at 2551 (citing Nagaredea, *Class Certification*, 84 N.Y.U. L. Rev. at 131-32) (a common contention capable of classwide resolution "means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in *one stroke*.") (emphasis added).

Far from resolving the entitlement issue in one stroke, the resolution of whether a putative class member qualified for a discount that he or she failed to receive requires highly individualized fact-based inquiries into each borrowers' relevant real estate transactions because discounts are applicable under First American's rate scheme only if title to the property was previously insured.  Plaintiffs unconvincingly argue that existence of a prior mortgage transaction—which is publicly recorded and easily ascertainable—is sufficient for the trier of fact to conclude a property's title was previously insured.  In other words, Plaintiffs allege that because the *majority* of real estate transactions in Kentucky require title insurance, a presumption of a prior title policy should be inferred from the mere existence of prior mortgage transaction.  (Doc. # 84 at 3-4).

Plaintiffs' recognition that "virtually" all real transactions require title insurance, necessarily exposes the deficiency of their request that title insurance be presumed purchased for any prior mortgage.  If not *all* real estate transactions require title insurance,

than the mere existence of a prior mortgage transaction cannot adequately identify all members of the proposed class: those who were overcharged title insurance based on their entitlement to a discount for having previously purchased title insurance within a certain look-back period (i.e. ten years). The Court will not draw this impermissible inference that Plaintiffs themselves acknowledge—not in so many words—would result in an over inclusive class definition. The record establishes that Kentucky, as well as its lenders, does not require the purchase of title insurance in every real estate transaction. (Doc. # 89, Exs. 4-6, 9, 15). Given the variation in mortgage products purchased in Kentucky, the Court agrees with Defendant that the "existence of a mortgage is not a proxy for title insurance." (Doc. # 89 at 2). Nielson & Sherry alone testified that from 2002 through the present, title insurance was not issued in approximately 75% of the transactions it closed. (Doc. # 84, Ex. 6 at 88:4-22). Moreover, the evidence First American tendered to the Court made clear its data repository does not conclusively indicate prior policy information, nor does it have the capability to identify those individuals that were charged the basic rate despite having had a prior policy on the same property's title. Determining the existence of a prior title insurance policy would certainly require individualized inquiry into each closing transaction and undermines Plaintiffs' position that Rule 23's commonality requirement is satisfied in this instance.

Particularly relevant in convincing the Court that commonality has not been met is the stark reality that not only are there no common answers to the question of liability, but there exists no common *method* for resolving the liability question. To resolve the overage issue, the trier of fact not only has to determine whether a borrower was entitled to a discount not received, but whether the borrower in fact paid a rate that "*exceeded* First

American's Rate Schedule filed with the Kentucky Department of Insurance." (Doc. # 84, Class Definition). This would require examination of each borrower's closing file because —for a certain percentage of Kentucky borrowers—the rate on file with the DOI during the class period would actually result in a less favorable title insurance premium. Unique to the Scotts' case is that the 1996 Substitution Rate (i.e. the rate on file with the DOI when the Scotts refinanced in 2004) resulted in a more favorable premium rate than if the 1999 Substitution Rate were applied. However, this is not the case for an obvious percentage of Kentucky borrowers.

The calculation can be summarized the following way. Prior to First American's 1999 amendments, it calculated its Substitution Rates on a sliding scale. *See* note 1 *supra*. The scale would require a borrower to pay a larger percentage of the basic rate depending on how recently the borrower had refinanced. In other words, the discount rate declined consistent with the age of the previous policy. Because the Scotts refinanced only six months prior to their November 2004 refinancing, they qualified for a 70% reduction from the basic rate. (Doc. # 1 at ¶ 23). The 1999 Substitution Rate replaced the 1996 sliding scale with a flat rate discount—if the previous refinance transaction occurred within the last ten years, borrowers were entitled to a 50% discount of the regular rate. Accordingly, under the 1999 Substitution Rate the Scotts would pay 20% more than the rate they claim they were entitled to receive based on the 1996 Rate Manual on file with the DOI in 2004. Although the 1996 Substitution Rate results in a more favorable discount for the Scotts, it is easy to see how the 1999 Substitution Rate would result in more favorable premium rates for a large percentage of borrowers.

For instance, for any borrower whose original loan was older than six years, the discount under the 1996 Substitution Rate would have required them to pay a percentage of the basic rate above and beyond the 50% discount offered under the 1999 Substitution Rate.[4]  The 1999 Substitution Rate also allowed borrowers to collect the discount for a previous loan for up to ten year whereas the 1996 rate required borrowers to pay the basic rate if the prior policy was more than eight years old.  Thus, its entirely possible given that First American disseminated its 1999 rates at the time it filed its amendment, that a large segment of borrowers actually ended up paying less (i.e. the 1999 Substitution Rate) for title insurance, than the filed rates demanded (i.e. the 1996 Substitution Rate).

The moral of the story: there is no common method for ascertaining those members falling within the class parameters.  Even if the Court were inclined to rely on the presumption Plaintiffs advocate—that a prior mortgage transaction is indicative of a prior title insurance policy—the Court would still need to conduct an individualized inquiry of each borrower's refinance transaction to determine whether a particular borrower is indeed part of the class (i.e. paid a premium that *exceeded* the rate amount on file with the DOI). The varying results produced under the sliding scale of the 1996 Substitution Rate serve to underscore the difficulty of determining liability on a classwide basis.  The trier of fact would have to conduct a case-by-case inquiry into each borrower's circumstance to determine which rate they paid, and whether the rate they paid was actually more favorable

---

[4]<u>Age of Original Loan</u>       <u>Rate</u>
From 5 to 6 years       60% of regular rate
From 6 to 7 years       70% of regular rate
From 7 to 8 years       80% of regular rate

(Doc. # 84, Ex. 14, 17).  Thus, suppose the premium under the basic rate was $200, if a borrowers original loan age was seven years old, he or she would be required to pay $160 under the 1996 Substitution Rate, however, under the 1999 amended rates a borrower would only pay $100.

or less favorable than the rate on file with the DOI. If a title agent was instituting the 1999 Substitution Rate, while the 1996 Substitution Rate was still on file, a number of borrowers likely paid *less* than the scheduled rates filed with the DOI. There simply do not exist "questions of law *applicable in the same manner* to each member of the class" such that the common issue may be litigated for all members in an "economical fashion." *Falcon,* 457 U.S. at 155 (emphasis added). Commonality serves as a "guidepost[ ] for determining whether under the particular circumstances maintenance of a class action is economical," and here, it is not. *Id.* at 158 n.13. Accordingly, Plaintiffs fail to meet Rule 23(a)(2)'s commonality requirement.

One final matter regarding commonality deserves brief comment. Plaintiffs argue in their opposition to Defendant's notices of supplemental authority (Docs. # 95, 100) that Defendant impermissibly challenges the commonality requirement in its supplemental briefing, which it allegedly failed to do in its initial opposition to Plaintiffs' motion to certify. This argument lacks merit.

Just as a new issue may not be raised for the first time in a reply brief, *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 481 (6th Cir. 2003), the same is true for a new issue raised in supplemental briefing. Although Defendant relied heavily on "typicality" and "predominance" vernacular in challenging Plaintiff's motion for class certification, this reliance is not dispositive of the substantive legal issues actually challenged. The Sixth Circuit recognizes that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 728 (6th Cir. 2004) (quoting *Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir. 1998)), and further that Rule 23(a)(2)'s commonality requirement parallels Rule 23(b)(3) in that both require scrutiny of a common

question.  Rule (b)(3) simply "contains the more stringent requirement that common issues 'predominate' over individual issues."  *In re AMS*, 75 F.3d at 1084.  In arguing against predominance, Defendants never assert that common issues to the class actually exist.  In fact, Defendants argue that although Plaintiffs attempt to identify common "duty" questions, they fail to set forth any method for resolving such questions on a classwide basis; an argument that most assuredly challenges Rule 23(a)(2)'s commonality requirement at its core.  (Doc. # 89 at 2).

From the outset, Defendant has argued that despite "common questions" regarding whether a potential class member was entitled to a discount, that question could not be resolved without individualized inquiry.  (Doc. # 89) (Defendants specifically argued in their response in opposition that there exists no common proof for establishing the existence of a prior title insurance policy and that Plaintiffs failed to offer a common course of conduct by First American that can be analyzed absent individualized review of each borrower's closing file).  Nothing contained in Defendant's supplemental filing substantively changes its original argument presented in opposition, and thus, the Court properly considers Defendants arguments contained in its supplemental briefings.  (Docs. # 94, Ex. 1, # 98, Ex. 1).

## 2.      Rule 23(b)

In addition to satisfying the prerequisites of Rule 23(a), the class must satisfy at least one subsection of Rule 23(b) to warrant certification.  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000), *cert. denied*, 531 U.S. 1148 (2001); *Sprague*, 133 F.3d at 397.  Plaintiffs seek certification of a (b)(3) class.  Rule 23(b)(3) provides that an action may be maintained as a class action if the court finds that questions of law or fact common to the

members of the class predominate over any questions affecting only individual members, and the class action, as a procedural mechanism, is superior to other available methods for the fair and efficient adjudication of the controversy.  In other words, to satisfy (b)(3), "a plaintiff must establish that the issues in the class action that are subject to generalized proof . . . predominate over those issues that are subject only to individualized proof." *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quoting *Rustein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)).  The inherent protections of a (b)(3) class include: predominance, superiority, mandatory notice, and the right to opt out. *Wal-Mart Stores*, 131 S.Ct. at 2558.

Plaintiffs argue that because "the focus [in this case] is on Defendant's conduct, the questions of law and fact predominate over any individual issues that may arise."  (Doc. # 84 at 33).  Plaintiffs are mistaken.  To resolve whether First American was unjustly enriched, the trier of fact must focus on each prospective class members' real estate transaction as well as the rates applied by each independent title agent.

Plaintiffs are adamant that where the issue of liability is common to the entire class, such issues will predominate.  Although an accurate statement of the law generally, Plaintiffs are mistaken that liability is a common issue as it relates to each putative class member *in this case*.  While the issue of whether class members were overcharged a title insurance premium may—at some level of broad generality—be common to the class, determining whether an overage actually occurred is an individualized inquiry, subject to individualized proof.  In their motion to certify, Plaintiffs preemptively argue that three cases out of Ohio that either declined to certify or decertified a previously certified class involving overages of title insurance premiums, are meaningfully distinguishable.  (Doc. # 84 at 34)

(citing *Chesner v. Stewart Title Guar. Co.*, No. 1:06CV00476, 2009 WL 585823 (N.D. Ohio Jan. 9, 2009) (decertifying a class); *Randleman v. Fidelity Nat'l Title Ins. Co.*, 264 F.R.D. 298 (N.D. Ohio 2009) (decertifying a class); and *Macula v. Lawyers Title Ins. Corp.*, 264 F.R.D. 307 (N.D. Ohio 2009) (declining to certify a class)).  Though on appeal at the time Plaintiffs filed their motion for class certification, the Sixth Circuit affirmed the district court's decision in *Randleman* to decertify just weeks after Plaintiffs' motion.  *Randleman v. Fidelity Nat'l Title Ins. Co.*, --- F.3d ---, 2011 WL 1833198, at *8 (6th Cir. 2011).

The issue on appeal was whether the district court abused its discretion when it concluded common issues did not predominate in the *Randleman* class.  It was only through independent review of each closing transaction that a trier of fact could ascertain whether borrowers were improperly denied a title insurance discount, and thus, predominance under (b)(3) failed, the Circuit concluded.  Plaintiffs contend *Randleman* has little applicability to the case at bar.  The Court disagrees.

In an effort to minimize its import, Plaintiffs divert the Court's attention to the so-called "notice" requirement contained in Ohio's Title Insurance Rate Manual otherwise not included in Kentucky's Rate Manual.  In Ohio, borrowers are entitled to a title insurance discount when "the Insurer is given a copy of the prior policy, or other information sufficient to enable the Insurer to identify such prior policy upon which reissue is requested."  *Randleman*, 2011 WL 1833198, at *1.  Plaintiffs seemingly assert the lack of this notice requirement in Kentucky's rate manual is dispositive, so much so that *Randleman* and its progeny fail to offer this Court any "useful guidance" on the certification question.  (Doc. # 84 at 34).

Although ultimately unconvincing, Plaintiffs argument is not completely unfounded; *Randleman* contains some perplexing *dicta* relative to the notice issue. The Sixth Circuit acknowledged that "a district court might be within its discretion to certify [a title insurance] class," "[i]f the rate rules provided a discount to anyone who previously purchased title insurance, and [the rate rules] did not contain a notice requirement." 2011 WL 1833198, at *6. Notably, though, the Circuit did not conclude that a court *should* certify a class in the absence of a notice requirement, only that it might be within in its discretion to do so. This *dicta* is hardly a ringing endorsement that certification is proper in the absence of a notice requirement. The Court undertook its discussion in an attempt to distinguish the case before it from *Daffin v. Ford Motor Co.*, 458 F.3d 549 (6th Cir. 2006), a case the *Randleman* plaintiffs relied upon to argue for certification. *Daffin*, however, is not justifiably analogous to warrant any meaningful comparison.

The Sixth Circuit in *Daffin* affirmed a district court's certification of a class of plaintiffs who owned vehicles containing an allegedly defective throttle body. Although some of the members of the class had yet to experience any difficulty with their actual throttle body, the court was content to certify the class on the theory that, if found defective, every member of the class would have experienced an "injury" for breach of an express warranty. *Id.* at 552-54. Once liability was decided on a classwide basis, potential members could establish their membership in the class by tendering proof they owned a 1999 or 2000 Mercury Villager minivan. Central to the court's conclusion, was its finding that individuals who owned the car were "injured" even if they had not personally experienced a stuck throttle body. This finding is significant and meaningfully distinguishable from both *Randleman* and the case before this Court.

Whether all 1999 and 2000 Mercury Villager minivans contained a defective throttle bottle was a common liability question, the answer of which was not *dependent* upon a particular class member's individual circumstances.  In other words, the resolution was not dependent on individual inquiries into each car owner's experience.  It therefore made sense to allow a person to establish membership in the class after-the-fact through presentment of title (i.e. after it was established whether the throttle body was indeed defective.).   Here, as in *Randleman*, the issue central to Plaintiffs claims is whether the putative class members were wrongly denied a title insurance discount and subsequently paid a premium that exceeded filed rates; put differently, whether First American was unjustly enriched.  This is not an inquiry common to the class, but rather, is instead dependent upon a review of *each* potential class member's specific real estate transaction. Liability turns on a series of individualized questions: (1) did the potential class member purchase a prior title insurance policy on the same property at the time of refinance?; (2) what year did the potential class member purchase that policy?; and (3) what premium rate was the potential class member charged at refinance?  "[C]lass issues cannot predominate when the resolution of those common issues in the plaintiff's favor could not result in a finding of liability against the defendant on a classwide basis."  *Corwin v. Lawyers Title Ins. Co.*, --- F. Supp. 2d ---, 2011 WL 3346824, at *7 (E.D. Mich. Aug. 1, 2011); *see also Randleman*, 2011 WL 1833198, at *6 ("The only way to resolve these particular claims and establish whether [the title insurer] improperly refused to give the refinance discount is to consider what [it] knew about each individual transaction at the time it issued a policy by examining each individual transaction.").

The issue of class membership is further complicated by the fact that here, unlike in *Daffin*, most potential plaintiffs would not be able to simply present a copy of the lender's policy they purchased because the lender's policy is issued directly to the lender and is not publicly recorded. Accordingly, not only is proof of prior insurance central to resolution of the issue of unjust enrichment, it is also not usually within the asserted class member's possession (i.e. contrast that with a vehicle owner who possesses his or her title). Thus, in this Court's view, the notice requirement does not meaningfully change the certification analysis in the title insurance context. Regardless of any notice requirement, under both Kentucky and Ohio rate manuals, the existence of prior title insurance is a necessary prerequisite for borrowers to qualify for the claimed discount. *Corwin v. Lawyers Title Insurance Company*, --- F. Supp. 2d ---, 2011 WL 3346824 (E.D. Mich. 2011), is persuasive on this point.

The proposed class in *Corwin* consisted of those persons who were allegedly entitled to but did not receive a discounted rate on title insurance. The applicable Michigan rate manual, like Kentucky, did not contain a notice or presentment requirement that obligated the borrower to present his or her prior policy before application of the discount. Nonetheless, the district court concluded that plaintiffs failed to satisfy Rule 23(a)(2)'s commonality requirement and (b)(3)'s predominance requirement. *Id.* at *6-7. Likewise, the Court finds that the requirements of commonality and predominance fail notwithstanding a "presentment of policy" requirement in the Rate Manual itself. *Id.* at *6-7. Apart from an individualized inquiry into each residential refinance transaction within the class period, there is no common method for identifying which transactions were insured by a previous policy. The rate manual further makes clear that borrowers' entitlement to

a discount arises from the existence of a previous title insurance policy. Certifying a (b)(3)

class for those who paid a premium that "exceeded" filed rates necessitates an intensive

fact-finding mission into the circumstances of each borrowers' refinancing transaction.

Neither the predominance nor superiority requirements are satisfied here; the

predominance of common versus individual issues has not been established by Plaintiffs.

There is simply no evidence that a classwide determination of liability on Plaintiffs' alleged

theories would be possible. *Cox v. Am. Synthetic Rubber Co.*, 2008 WL 5381909, at *6

(W.D. Ky. Dec. 18, 2008).[5]

Plaintiffs, in their supplemental briefing, argue against the relevance of *Corwin* to

the instant action. (Doc. # 100). Specifically, Plaintiffs contend that *Corwin* "misses the

mark in its application of Rule 23's commonality provisions," because it "confuses easily

addressed issues of manageability, with commonality." (*Id.* at 2). This contention is

unavailing.

To deflect the significance of the *Corwin* decision, Plaintiffs minimized the glaring

difficulty of resolving this litigation in one stroke. To do so, Plaintiffs again fall back on their

ill-conceived premise: existence of a prior policy may be presumed in most instances. (*Id.*

at 3). And, absent this presumption, Plaintiffs advocate that class adjudication is still the

superior procedural mechanism because individualized inquiry into each closing

transaction does not eviscerate the commonality requirement, which they believe is met

because objective methods for determining prior existence of a policy. Plaintiffs' argument

simply defies logic.

---

[5]In view of the Court's conclusions that the proposed class fails to satisfy the commonality and predominance requirements of Rule 23(a) and (b)(3), the Court need not address whether Plaintiffs have satisfied the remaining Rule 23(a) criteria for class certification.

Whether objective methods exist to assess liability is not the inquiry. The inquiry is whether there is an objective touchstone common to the class for resolving the inquiry in the first instance. Here, there is not. The Court cannot determine whether First American was unjustly enriched as a result of its failure to properly file the 1999 Substitution Rate amendments through one collective inquiry. As discussed previously, in some transactions First American likely overcharged borrowers while simultaneously undercharging others. Although individualized inquiry touches on the issue of manageability, that reality does not foreclose its relevance to Rule 23's commonality requirement. The level of individualized inquiry required in this case is cancerous to a finding of commonality; there is no common method for resolving to whom Defendant is liable. And again, common questions alone will not suffice to establish the Rule 23(a)(2) requirement. Of course, borrowers who refinanced during 2002-2007 may need *identical* questions resolved: was I overcharged for title insurance given First American's clerical error in its schedule of rates? But, the answer to this question is not ripe for class consideration. Its resolution depends too heavily on individualized proof and circumstances.

Moreover, Plaintiffs are conveniently silent on the issue of predominance. Their silence seems a tacit recognition that the depth with which each closing file must be examined to even begin resolving issues of unjust enrichment signals the insurmountable nature of 23(b)(3) certification. That individualized proof is necessary to determine whether a borrower was overcharged for title insurance renders impotent the virility of the class action in this case. Accordingly, the Court finds *Corwin* persuasive in support of its conclusion that neither the commonality nor predominance requirements of Rule 23 have been satisfied here.

## III. CONCLUSION

In conclusion, and for the reasons stated herein, **IT IS ORDERED** that:

(1)    Plaintiffs' Motion to Certify Class (Doc. # 84) is hereby **denied;**

(2)    Defendant's Motion for Leave to File Notice of Supplemental Authority (Doc. # 98) is hereby **granted**, the authority of which was considered and analyzed in the Court's decision herein; and,

(3)    **Within twenty (20) days** from the date of this Order, Plaintiffs shall file a status report indicating how they intend to proceed going forward.  More specifically, Plaintiffs shall notify the Court whether they intend on pursuing their claims on an individual basis or seek an appeal of the Court's denial of their motion for class certification.

This 31st day of August, 2011.



**Signed By:**

*David L. Bunning*

**United States District Judge**